USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: OCT 17 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                                                        :
STACY LIGGAN,                                           :
                                                        :
                            Petitioner,                 :
                                                        :                    No. 11-cv-1951 (RA)
                    -v-                                 :
                                                        :                    OPINION AND ORDER
DANIEL SENKOWSKI,                                       :
                                                        :
                            Respondent.                 :
                                                        :
--------------------------------------------------------X

RONNIE ABRAMS, United States District Judge:

 In this petition for habeas corpus under 28 U.S.C. § 2254, Stacy Liggan—who is now *pro se* but was represented by counsel at his two trials and on direct appeal—challenges his convictions for crimes arising from his participation in an attempted robbery in Harlem that resulted in the shooting of a New York City Police Captain.

 This Court referred Liggan's Petition to Magistrate Judge Andrew Peck for a Report and Recommendation ("R & R"). In the seventy-page R & R, Judge Peck recommended that the Petition be denied and that a certificate of appealability not issue. Liggan has filed four objections. For the following reasons, those objections are overruled and the Petition is denied. The Court concludes, however, that a certificate of appealability should issue as to the following question: did the First Department unreasonably apply clearly established federal law when it held that Liggan was not entitled to a new trial on the grounds that the trial court denied him the right to present a defense?

## BACKGROUND

 The Court assumes the parties' familiarity with the facts and procedural history underlying the Petition, as described in Judge Peck's thorough and well-reasoned R & R, and

sets out only those facts necessary to understand the instant Order.

According to the People's testimony at trial, on August 26, 2003, Liggan, Roland Roberts, Edward Bowman, and Jason Rivera agreed to drive from the Bronx to Manhattan to rob an illegal gambling establishment in Harlem. (See 11/2/05 Rivera Test. 884-88, 899-901; 11/1/05 Deal Test. 689-91.[1]) Bowman provided the car and was to be the driver; Liggan and Roberts planned to enter and display their guns while Rivera collected money and other valuables from the patrons. (Rivera Test. 899; 11/7/05 Verona Test. 1188.)

The four left the Bronx late on August 26. During the ride into Manhattan, Roberts removed two bullet proof vests and hooded sweatshirts from a bag, which he and Liggan put on. (Rivera Test. 903.) Roberts also removed three guns: one for Liggan, one for Bowman, and one for himself. (Id. at 904-05.) Rivera did not need a gun because he had a knife. (Id. at 905.)

The four individuals arrived in Harlem shortly after midnight on August 27. (See 10/26/05 Girven Test. 134.) Although they pulled onto the block where the establishment was located, they never made it inside. After exiting Bowman's car and walking toward the establishment, Roberts was stopped by a plainclothes police officer, Captain Kenneth Girven. (Rivera Test. 910-12; Girven Test. 136-39.) Roberts ducked behind a parked car. (Girven Test. 139.) While Captain Girven was trying to get Roberts to come out from behind the car, Liggan began walking towards Captain Girven, at which point Girven noticed that Roberts nodded towards Liggan, who began backing away. (Id. at 139-41.) Suddenly, Roberts jumped out from behind the car and shot at Captain Girven. (Id. at 141.) One of the bullets struck Given underneath his bullet proof vest, in the lower abdomen. (Id. at 141-42.)

After the shooting, Liggan and Roberts rushed to Bowman's car and the three drove back

---

[1]      Citations to the trial transcript refer to Liggan's second trial, unless otherwise noted.

to the Bronx. (Liggan Prior Test. 1295-97; Girven Test. 153.)  Rivera ran from Harlem all the way back to the Bronx. (Rivera Test. 914-18.)  A number of police officers arrived at the scene, and Given underwent emergency surgery, from which he ultimately recovered. (Girven Test. 157-58.)

All four of the individuals—Bowman, Roberts, Liggan, and Rivera—were eventually arrested for their involvement in the shooting.  Liggan was charged with assault in the first degree, attempted robbery in the first and second degrees, criminal possession of a weapon in the second and third degrees, and conspiracy in the fourth degree.  (See Declaration of Priscilla Steward "Steward Decl." Ex. S at 1 (trial court's decision on Liggan's motion for a new trial).)  The evidence against him included a series of incriminating text messages between him and Roberts; the testimony of Rivera, pursuant to a cooperation agreement, as well as the testimony of two other individuals (Joseph Varona and Desmond Deal) whom Liggan had unsuccessfully attempted to recruit to assist him and Roberts in the robbery that night; and a letter Liggan wrote to Roberts from prison in which he made several inculpatory statements.

At his first trial, Liggan was found guilty of criminal possession of a weapon in the third degree; the jury could not agree on a verdict as to any of the other counts. (Steward Decl. Ex. S at 1.)  He was re-tried and, based on substantially similar evidence, was convicted of assault in the first degree, attempted robbery in the first and second degrees, and conspiracy in the fourth degree. (Steward Decl. ¶ 1.)  Liggan was sentenced to sixteen years to life on the weapon charge, twenty-five years to life on the assault and attempted robbery charges, and two to four years on the conspiracy count, all of which were to run concurrently.  (Id.)  The Appellate Division, First Department, unanimously affirmed both judgments of conviction, and the New York Court of Appeals denied leave to appeal. See People v. Liggan, 878 N.Y.S.2d 735 (1st

3

Dep't 2009), <u>lv. denied</u>, 13 N.Y.3d 908 (2009).

## DISCUSSION

Liggan asserts that Judge Peck erred by rejecting (1) his claim that the prosecutor violated his due process rights at his second trial by questioning Varona about Liggan's drug dealing (Pet'r's Objs. at 1-4); (2) his challenge to the constitutionality of New York's persistent violent felony offender statute (<u>id.</u> at 4-8); (3) his argument that appellate counsel was ineffective at his first trial for failing to challenge the sufficiency of the evidence underlying his criminal possession of a weapon conviction (<u>id.</u> at 8-10); and (4) his argument that appellate counsel was ineffective for failing to argue that trial counsel's handling of alleged juror misconduct at his first trial amounted to ineffective assistance of counsel (<u>id.</u> at 10-13).

When reviewing a report and recommendation, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court renews *de novo* those portions of the R & R to which specific objections are made, <u>id.</u>, whereas it reviews only for clear error those portions of the report to which no party has objected, <u>see, e.g.</u>, <u>Sacks v. Gandhi Eng'g</u>, Inc., 999 F. Supp. 2d 629, 632 (S.D.N.Y. 2014). The Court must construe a *pro se* litigant's papers "liberally and interpret them to raise the strongest arguments that they suggest." <u>Kirkland v. Cablevision Sys.</u>, 760 F.3d 223 (2d Cir. 2014).

To be entitled to federal habeas relief under the Antiterrorism and Effective Death Penalty Act (AEDPA), Liggan must demonstrate that any claim adjudicated on the merits in his state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the

4

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court

has explained, "a state court's determination that a claim lacks merit precludes federal habeas

relief so long as fairminded jurists could disagree on the correctness of the state court's

decision." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 786 (2011).

## 1.    Evidence of Uncharged Crimes

Liggan asserts that his due process rights were violated at his second trial when the

prosecutor elicited testimony from Varona—one of the individuals Liggan attempted

unsuccessfully to recruit to assist in the robbery—about Liggan's drug dealing activities. (Pet'r's

Objs. at 1-4.) The exchange during Varona's direct examination proceeded as follows:

> Q:    You mentioned that you first got high with [Roland Roberts] and then you did
> something else with him.  What was that?  Were you ever involved in drug
> sales?
>
> A:    Yes.
>
> Q:    Were you involved in that with Roland Roberts?
>
> A:    Yes.
>
> Q:    Can you tell us about that?
>
> A:    I—when I needed money, I just used to go to him just to get drugs just to sell.
>
> Q:    Was it only Roland Roberts that you were selling drugs for?
>
> A:    And Stacy Liggan.
>
> MR. HORNSTEIN: Objection. May we approach?
>
> THE COURT: Yes.
>
> (Whereupon, a discussion takes place off the record between the Court and counsel at
> the bench.)
>
> THE COURT: That statement about Mr. Liggan is stricken from the record.  Go
> ahead.

(Varona Test. 1171.)

After cross examining Varona, Defense counsel moved for a retrial—a request he apparently made off the record during the portion of Varona's direct examination excerpted above—based on Varona's testimony about Liggan's drug dealing. (11/7/05 Tr. 1252-53.) The trial court denied that request without elaboration. (Id. at 1255.) During Liggan's appeal, the First Department did not address specifically Liggan's argument that the trial court erred in admitting this evidence, but stated that it had "considered and rejected defendant's arguments regarding his second trial." People v. Liggan, 878 N.Y.S.2d 735, 738 (1st Dep't 2009).

Like the Federal Rules of Evidence, New York precludes the admission of testimony of uncharged crimes because such evidence "invites a jury to misfocus, if not base its verdict, on a defendant's prior crimes rather than on the evidence—or lack of evidence—relating to the case before it." People v. Rojas, 97 N.Y.2d 32, 36-37 (2001). This evidence may, however, be admissible if offered for some purpose other than to show the defendant's propensity to commit crimes, such as to demonstrate motive or intent with respect to the charged crime. See id. at 37 & n.2.

The question by the prosecutor—which was obviously designed to elicit testimony that Varona sold drugs for Liggan—was improper, as the trial court promptly recognized. Nonetheless, Liggan is not entitled to habeas relief based on the admission of this evidence.

As the transcript excerpt illustrates, the trial court struck Varona's answer from the record. Earlier in the trial, the court instructed the jurors that because it was the "sole judge of law in this courtroom," if "someone objects and I sustain the objection, I believe the question or the answer is improper. You may not consider it." (10/26/05 Tr. 7.)

The Second Circuit has explained that courts must "presume that a jury will follow an

instruction to disregard inadmissible evidence unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." Jackson v. Conway, 736 F.3d 115, 148 (2d Cir. 2014). Here, Liggan has offered no reason why the jurors would have been unable to follow the trial court's instruction. Nor has he demonstrated that the admission of this single reference to his alleged drug dealing was "devastating"—particularly in light of the substantial evidence, much of which was offered by Liggan, that his confederates were involved in the drug trade. (See, e.g., 10/26/05 Tr. 43, 71, 76; 11/2/05 Tr. 963-68.)

Liggan is not entitled to habeas relief for another reason: as Judge Peck explained (R & R at 51), and as a number of courts in this District have pointed out, the Supreme Court has not yet held that the admission of uncharged crimes violates the Due Process Clause, see, e.g., John v. New York, 12 CIV. 1944 CM JCF, 2013 WL 6487384, at *1, *9 (S.D.N.Y. Nov. 25, 2013); In re Petition of Michael Johnson, 10 CIV. 3449 RJS, 2013 WL 4528846, at *4 (S.D.N.Y. Aug. 27, 2013). Although Liggan cites Michelson v. United States, 335 U.S. 469 (1948), that case merely recognized the "common-law tradition" of precluding the prosecution from offering evidence of the "defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime," id. at 475. In a case decided almost fifty years later, the Supreme Court specifically left open the question of "whether a state law would violate the Due Process Clause if it permitted the use of prior crimes evidence to show propensity to commit a charged crime." Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991). Liggan thus has not demonstrated that "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), provides that the admission of evidence of uncharged crimes violates a

defendant's due process rights.[2] He is therefore not entitled to habeas relief on this basis.

## 2.    New York's Persistent Violent Felony Offender Statute

New York's violent felony offender statute provides that individuals convicted of a

"violent felony offense," who have "two or more predicate violent felony convictions" are to be

sentenced to an indeterminate term of imprisonment—the maximum term of which is life, and

the minimum term of which is prescribed by statute. See N.Y. Penal Law § 70.08.

Liggan did not dispute that he had two prior "predicate violent felony convictions": a

1996 conviction for attempted criminal possession of a weapon in the third degree and a 1999

conviction for criminal possession of a weapon in the third degree. (3/9/05 Tr. 10-12; 12/14/05

Tr. 2-5.[3]) These prior convictions increased both the minimum and maximum term of sentence

he faced for the instant crimes. Compare N.Y. Penal Law § 70.02, with id. § 70.08. Increasing

his sentence on the basis of these prior convictions was unconstitutional, Liggan argues, where

the existence of the underlying convictions had not been found by a jury beyond a reasonable

doubt. (Pet'r's Objs. at 4-8.) The First Department specifically rejected this claim. People v.

Liggan, 878 N.Y.S.2d 735, 738 (1st Dep't 2009).

Although the Supreme Court has held that a defendant's statutory sentencing exposure

may not be increased based on facts not found by a jury beyond a reasonable doubt, see, e.g.,

Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), it has carved an exception to this rule for

---

[2]    Judge Peck also rejected this claim on the grounds that Liggan testified, during his direct examination, about his drug dealing activities. (R & R at 50-51.) Defense counsel noted, however, after the admission of evidence about Liggan's criminal past during the government's case in chief: "I'll have to deal with it on my case." (Tr. 1311.) Because this statement suggests that defense counsel would not have elicited the testimony absent the admission of the evidence on Varona's examination, the Court declines to rely on Liggan's own testimony about his drug dealing as a separate ground for denying him habeas relief.

[3]    With respect to the first trial, Liggan admitted the convictions when canvassed by the trial court at a conference shortly after the first trial, and with respect to the trial Liggan similarly admitted the convictions at sentencing.

sentences that are increased based on "the fact of a prior conviction," id. Although the majority

in Apprendi questioned the continuing vitality of this exception, see id. at 489-90, it did not

disturb it, and specifically declined to revisit the issue in a recent opinion that clarified the reach

of Apprendi, see Alleyne v. United States, 133 S. Ct. 2151, 2160 n.1 (2013). The Second Circuit

has similarly endorsed the continuing vitality of this exception. See Portalatin v. Graham, 624

F.3d 69, 80 (2d Cir. 2010) (en banc).[4] Liggan's objection is thus without merit.

### 3.    Sufficiency of the Evidence at Liggan's First Trial

Liggan next asserts that his appellate counsel was ineffective for failing to challenge the

sufficiency of the evidence at his first trial. (Pet'r's Objs. at 8-10.) In Liggan's view, the

evidence was insufficient to support his conviction for criminal possession of a weapon in the

third degree. (Id.) Some background is necessary to understand his argument.

At Liggan's first trial, the prosecution offered evidence that detectives recovered a forty-

caliber, semi-automatic "Firestar" handgun underneath a vehicle at the scene. (1/24/05 P. Walsh

Test. 270-71.) Because the weapon's chamber was empty and seven cartridges were in the

magazine, detectives concluded that the weapon had not been fired. (Id. at 272.) Indeed,

ballistics testing confirmed that the two discharged bullets and three nine-millimeter shell

casings also recovered from the scene had not been fired from the Firestar (or from Captain

Girven's gun). (1/27/05 C. Walsh Test. 738.) Detectives did not recover the gun used to shoot

Captain Girven. (Id.)

---

[4]        The one district court case on which Liggan relies, Portalatin v. Graham, 478 F. Supp. 2d 385 (E.D.N.Y. 2007), addressed a different aspect of New York's sentencing scheme and did not consider the constitutionality of increasing a defendant's sentence based on the fact of a prior conviction. This case, however, was reversed by the Second Circuit—which, as noted above, specifically recognized the exception for prior convictions. See 624 F.3d at 80.

The prosecution argued at the first trial that Liggan was guilty of criminal possession of a weapon because he jointly possessed the weapon Roberts had that night—the weapon that, in the prosecution's view, was used to shoot Captain Girven. (See 2/17/05 Tr. 1966 ("There was one gun that we know was fired. That was the gun that was used to shoot Captain Girven. That was the gun that Roland Roberts had . . . . We recovered the ballistics evidence, but there's—there is one gun. All [of] them are charged with possessing that gun.").) The trial court's jury instructions mirrored this argument. (See id. at 2025-26 ("[T]he only gun as to which you've heard evidence about the operability is the gun allegedly used to shoot Captain Girven and that is the only gun that you may consider in connection with this count . . . .").) The court also instructed the jury on the legal concepts of constructive possession and acting in concert, and noted that the prosecution was relying on these concepts to prove criminal possession of a weapon in the third degree. (Id. at 2014-15, 2026-30.)

In his defense, Liggan testified that after the shots were fired and he was running back to Bowman's car, he saw Roberts also running toward the car with a gun in his hand and then saw him throw the gun into the street before entering Bowman's car. (2/14/05 Liggan Test. 1518-19.) Liggan testified further that he had not provided this gun to Roberts. (Id. at 1505.) During summation, defense counsel argued that the gun Liggan saw Roberts throw was the gun officers recovered from the scene, and that because that gun had not been used to shoot Captain Girven, Rivera must have been the shooter. (Id. 1847.)

The jury convicted Liggan of criminal possession of a weapon in the third degree but could not reach a verdict on any of the other counts. (See Steward Decl. ¶ 1.)

During conversations with the jurors after the verdict, defense counsel learned that two jurors had voted to convict Liggan based on the gun Liggan allegedly saw Roberts throw as he

10

was running from the scene. (Id. Ex. O: 3/29/05 Hornstein Aff. ¶¶ 59-60.) These two jurors submitted affidavits, both of which stated that "[t]he conviction of defendant Liggan on one count of criminal possession of a weapon in the third degree was based upon our application of the Court's instructions relating to constructive possession and upon defendant Liggan's testimony that he observed Roland Roberts throw a gun on Bradhurst Avenue. Our conviction of defendant Liggan was for possession of the gun recovered on Bradhurst Avenue. Our conviction of defendant Liggan was not for possession of the gun that was used to shoot Captain Girven." (Id. Ex. O, 3/30/05 Kalba Aff. ¶¶ 5-7; id. Ex. O, 3/30/05 Harris Aff. ¶¶ 5-7.)

Based on these affidavits, Liggan's counsel moved to set aside the verdict. (Id. Ex. O.) The trial court denied that motion in a written opinion, concluding that unless the jurors' "reasoning process" was "the product of improper and/or outside influence," the jurors "may not impeach their own verdict by affidavit." (Id. Ex. S at 9.) Liggan's counsel also raised the issue in Liggan's appeal to the First Department, which rejected the argument. See People v. Liggan, 878 N.Y.S.2d 735, 738 (1st Dep't 2009) ("The branch of defendant's motion to set aside the verdict that alleged he was convicted on an improper theory was contrary to the rule precluding jurors from impeaching their verdict with regard to their deliberative processes." (citing People v. De Lucia, 20 N.Y.2d 275 (1967))).

The basis for Liggan's ineffective assistance claim with respect to this issue is less than clear. His appellate counsel devoted an entire section of his brief in the First Department to arguing that Liggan was convicted "of possessing a firearm that he had not been charged with possessing." (Steward Decl. Ex. A at 70.) Insofar as Liggan now asserts that his appellate counsel should have framed the argument as an attack on the sufficiency of the evidence supporting the weapon possession charge, as opposed to asserting that Liggan was convicted

11

under a theory the prosecution did not present, that argument is unpersuasive. The evidence was sufficient to convict Liggan of possessing the gun that shot Captain Girven. Among other evidence, Captain Girven testified that Roberts shot him (2/7/05 Girven Test. 696); Rivera testified that Liggan and Roberts worked in tandem to plan the robbery and to arrange and distribute the guns (2/8/05 Rivera Test. 946-47[5]); and the prosecution read into evidence a letter that Liggan wrote from prison to Roberts, describing how the police interrogated him about the shooting of Captain Girven, and indicated that "all they want is the vest and gun. You know I was stuck but never folded" (2/1/05 Wilborne Test. 348). Viewed in the light most favorable to the prosecution, a jury could have concluded that Liggan was in constructive possession of the gun that shot Captain Girven. See, e.g., People v. Allen, 720 N.Y.S.2d 72, 73 (1st Dep't 2001) (concluding that one individual was in constructive possession of a weapon recovered from his companion's bag, where the circumstances suggested the weapon was "an instrumentality of their joint criminal enterprise").

Liggan has not adequately identified any way in which his appellate counsel's performance was deficient, nor has he shown "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694 (1984). He thus cannot make out an ineffective assistance claim.

Rather, Liggan's argument largely seems to be that the trial court and First Department erred by refusing to set aside his conviction after two jurors averred in post-verdict affidavits that they had convicted him on the basis of a legal theory the prosecution had not presented. This

---

[5]      Specifically, at the first trial, Rivera testified that during the ride from the Bronx to Harlem, "[w]hen [Roberts] was giving Mace [i.e., Liggan] whatever he had—I mean, when he was giving Mace his—the gun, bulletproof vest and the sweater, Ro—they started putting it on, so Mace—I mean Ro, Ro had asked Mace like, 'Yo where is my other stuff at,' referring to the other gun. He was like 'Yo, I put it there. Check.' (Rivera Test. 946-47.) Rivera clarified that Mace said he had put a gun "there"—in "a little pocket, like a zipper pocket on the bag." (Id. at 947.)

argument, however, does not present a basis for habeas relief.

Courts must take into account several competing considerations when deciding whether to disturb a verdict based on a juror's post-trial affidavit. Readily permitting verdicts to be overturned would encourage defeated parties to "harass" and "beset" jurors "in an effort to secure from them evidence of facts which might establish misconduct sufficient to overturn a final judgment." Munafo v. Metro. Transp. Auth., 381 F.3d 99, 107 (2d Cir. 2004). Moreover, such a practice would result in a loss of "frankness and freedom of discussion" in deliberations, and might lead juries to "revise special verdicts retrospectively in order to achieve a preferred result." Id. At the same time, however, "simply putting verdicts beyond effective reach can only promote irregularity and injustice," Fed. R. Evid. 606 Advisory Committee Notes, and the Supreme Court has held that certain post-verdict revelations require a new trial, see Parker v. Gladden, 385 U.S. 363 (1966) (remanding for a new trial based on bailiff's statements to jury during its deliberations).

Although of course not binding on state courts, the Federal Rules of Evidence balance these competing considerations by permitting courts to receive post-verdict testimony or affidavits from jurors only concerning whether "extraneous prejudicial information was improperly brought to the jury's attention; an outside influence was improperly brought to bear on any juror; or a mistake was made in entering the verdict on the verdict form." Fed. R. Evid. 606(b). Otherwise, "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Id. The Advisory Committee notes make clear that this prohibition extends to a juror's testimony or affidavit addressing "misinterpretations of instructions." Id., Advisory Committee Notes.

New York's Court of Appeals has provided for a similar rule, explaining that "[w]here, as in the case of statements regarding juryroom deliberations, every verdict might be rendered suspect, and jurors might become subjected to continuous posttrial harassment, the public policy reasons for holding such statements inadmissible must ordinarily override possible injustice to a defendant, for here our jury system itself is at stake." People v. De Lucia, 20 N.Y.2d 275, 279 (1967). Statements "concerning outside influences on a jury, however, occurring less frequently and more susceptible to adequate proof, should be admissible to show that the defendant was prejudiced, for here the danger to our jury system is minimal compared with the more easily proven prejudice to the defendant." Id.; see also People v. Maragh, 94 N.Y.2d 569, 573 (2000) ("Generally, a jury verdict may not be impeached by probes into the jury's deliberative process; however, a showing of improper influence provides a necessary and narrow exception to the general proposition."). It was on the basis of these authorities that the trial court and First Department rejected Liggan's motion for a new trial.

Liggan's argument that the jurors misapplied the instructions, and convicted him on an alternate theory of proof not presented at the trial, does not provide a basis for inquiring into the jury's deliberative processes under either the federal or New York rule. Absent Supreme Court precedent that the Constitution requires more, Liggan's claim for relief must yield to the strong public policy reasons that preclude courts from re-examining the mental processes underlying a jury's verdict.

**4.      Potential Juror Misconduct**

Liggan next asserts that Judge Peck erred by dismissing his other ineffectiveness of counsel claim. (Pet'r's Objs. 10-14.) In Liggan's view, his appellate counsel should have argued that counsel at his first trial was ineffective for failing to inquire into potential juror

14

misconduct. As with Liggan's previous claim, some background is necessary.

### A.      Background

After the third day of trial, Liggan's counsel notified the court of a newspaper article

related to co-defendant Roland Roberts. The following colloquy ensued among the Court, Mr.

Stone (Bowman's attorney[6]), Mr. Hornstein (Liggan's attorney), and Mr. O'Keefe (the Assistant

District Attorney):

| | |
|---|---|
| [MR. HORNSTEIN]: | My client has just advised me—I don't have any personal knowledge of this—but Mr. Roberts, apparently, made the papers within the last few days. |
| | I don't know if any of the jurors had an opportunity to read that, but perhaps some inquiry should be made of these jurors about whether or not they read anything related to Mr. Roberts. |
| MR. O'KEEFE: | The only thing that I've seen, I think, was one sentence, a very small one, maybe the first day of jury selection. |
| MR. HORNSTEIN: | Mr. Liggan will provide me with the article. I'll take a look at it then. |
| MR. STONE: | Judge, apparently he got into a fight with somebody, even more notorious than him, and broke his jaw. |
| MR. O'KEEFE: | That's the one sentence that I'm aware of. |
| | But presumably, the jurors are following the Court's instructions anyway. |
| THE COURT: | Presumedly. |
| | Maybe mister—whatever his name is— |
| MR. HORNSTEIN: | Roberts. |
| THE COURT: | No, you. |
| MR. HORNSTEIN: | Hornstein. |
| THE COURT: | Thank you. |
| | Maybe you'll tell me what kind of an inquiry you want to make. |
| | Because given what I understand to be the coverage and the mention, I think it's asking for trouble. |
| MR. STONE: | I'm not asking for any inquiry, Judge. |

---

[6]      Co-defendant Bowman was tried jointly with Liggan at Liggan's first trial.

| THE COURT: | He'll leave well enough alone. |
| | So you come back and tell me what you want me to do. |
| MR. HORNSTEIN: | I think that, perhaps, just a reiteration that they are not to view any type of media-related material to this case. |
| THE COURT: | Well, I've said it a number of times.  So, I'll say it again. |
| | Fine with me. |

(1/25/05 Tr. 646-47.)  Although counsel raised this issue after the jury had left for the day, when the Court dismissed the jurors the following day for the weekend it reminded them that they were not to read about the case or to watch or listen to any reports about the case.  (Id. at 928.)

As discussed in the previous section, after Liggan's first trial, two jurors submitted affidavits.  In addition to describing the basis upon which they convicted Liggan, the affidavits stated that after the verdict was rendered they learned that one of the jurors had been aware that Roberts had been convicted of the shooting of Captain Girven.  The first affidavit, submitted by the jury foreperson, stated that "[f]ollowing the verdict juror number three made a statement in the jury room, in the presence of several other jurors, that she was aware, during trial and during deliberations, that Roland Roberts had either pled guilty to the attempted murder of Captain Girven or was serving time for the attempted murder of Captain Girven.  Juror number three did not disclose this information to me or, to the best of my knowledge, to any other member of the jury during the trial or the deliberations.  Juror number three was one of the jurors who voted to convict defendant Liggan.  Juror number three was particularly insistent on persuading the other jurors to convict defendant Liggan."[7]  (Steward Decl., Ex. O: 3/30/05 Decl. of Carole Kalba ¶¶ 8-11.)  The affiant further stated that she contacted the trial judge "[w]ithin a few days of

---

[7]      The affidavit also stated that the jury had unanimously voted to convict Liggan of criminal possession of a weapon in the third degree—based on the theory described in the previous section—and that "the majority of the jurors voted for the acquittal of defendant Liggan on the remaining five counts."  (Steward Decl., Ex. O: Decl. of Carole Kalba ¶¶ 3-5.)  The other juror's affidavit also stated that "the majority" of jurors were in favor of acquittal on these counts.  (Id.: Decl. of Raymond Harris ¶ 4.)

16

reaching the verdict" to inform her of juror three's statement.  (Id. ¶ 12.)

The second affidavit makes a nearly identical assertion with respect to juror three's statement; it confirms that the juror did not disclose the information to the affiant or, to the affiant's knowledge, any other juror; and it states that "juror number three was one of the jurors who was in favor of convicting defendant Liggan on all charges."  (Id., 3/30/05 Decl. of Raymond Harris ¶ 10.)  Unlike the foreperson's affidavit, this affidavit does not state that juror number three was "particularly insistent" on persuading the other jurors to convict Liggan.

Liggan submitted these affidavits to the trial court and moved to set aside the jury verdict. (Steward Decl., Ex. O.)  In connection with this briefing, the parties presented three articles, all published on January 20, 2005, which refer to Roland Roberts.  The focus of each article is a Rikers Island correction officer, Everett George, who was accused of killing his two children. Each article describes how George suffered a broken jaw from a prison fight.  The articles then identify the individual who punched George—Roland Roberts—and briefly note that Roberts was imprisoned for shooting Captain Girven.

The first article, published in Newsday and titled "Slaying Suspect Hurt in Rikers," states in the second paragraph that George "got clocked in the cellblock shared by another notorious inmate, Roland Roberts, 24, who is serving an 18-years-to-life sentence for the attempted murder of a police captain in Harlem last year."  (Steward Decl., Ex. Q at 7.)  The final paragraph of the article states that "Roberts, who shot Capt. Kenneth Girven in August 2003, was planning to rob a 154th Street social club when Girven came by in an unmarked car and noticed Roberts, a paroled drug dealer, ducking between parked cars.  When Girven yelled, 'Police.  What's up?' Roberts opened fire."  (Id.)

The second article, which consists of five sentences in the New York Daily News's

17

"Metro Briefings," is titled "Dad Denies Killing Kids." (Id. at 8.)  It states in relevant part that

George "was slugged Dec. 27 by attempted cop-killer Roland Roberts, 24.  Roberts is in for life

for attempting to kill NYPD Capt. Kenneth Girven in Harlem two years ago."  (Id.)

The third article the parties presented in their briefing was published in the New York

Post, and is titled "Kid-Killer Pop Attacked by Inmate."  (Id., Ex. R: 5/9/05 Hornstein Supp. Aff.

at 12.)  This article consists of four sentences; the first states that George "has suffered a broken

jaw, courtesy of a cop-shooter inmate at his workplace-turned-residence," and the fourth states

that "George had been slugged in the chin in a protective-custody unit last month by Roland

Roberts, 24, who had himself just been convicted of firing three shots into an NYPD captain."

(Id.)

The trial court denied Liggan's motion for a new trial in a written opinion, explaining that

"[i]f counsel wanted jurors questioned as to possible exposure to this publicity, and any resultant

effect on the ability of any juror so exposed to be fair, the request should have been made

contemporaneously and would have been granted at that time.  Defendant may not now complain

of facts concerning juror exposure to extraneous information from news articles that a reasonable

contemporaneous inquiry would have disclosed."  (Id. Ex. S at 6.)  The First Department

affirmed on similar grounds.  See People v. Liggan, 878 N.Y.S.2d 735, 737 (1st Dep't 2009)

("Since counsel was aware, during the trial, of a potential danger of exposure of jurors to this

information, but declined a remedy that would have obviated the need for postverdict

proceedings or a new trial, the postverdict disclosure was not a basis for setting aside the

verdict.").

Liggan first raised an ineffective assistance claim related to this issue in a coram nobis

petition he filed (Steward Decl. Ex. J ¶ 5), which the First Department denied without

explanation (Id. Ex. L.). Judge Peck also rejected the claim, noting that counsel's failure to inquire about the media coverage during trial "was a strategic decision made by counsel" and cited an affidavit trial counsel filed in support of the motion for a new trial, in which counsel stated "it's true that a 'strategic decision' was made to withdraw the initial request to make an inquiry of the jury." (R & R at 65 (quoting Steward Decl. Ex. R: Hornstein 5/9/05 Supp. Aff. ¶ 24).) "Because courts will not second-guess trial strategy," Judge Peck explained, a claim that trial counsel was ineffective would have lacked merit, and thus appellate counsel could not have been ineffective for failing to raise the argument. (Id. at 66.)

## B.   Discussion

As noted in the previous section, to prevail on an ineffective assistance of counsel claim, the defendant must show (1) "that counsel's performance was deficient"[—] so deficient that, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," and (2) "that the deficient performance prejudiced the defense." Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013) (citations omitted). The Second Circuit has repeatedly referred to this standard as "demanding." See, e.g., United States v. Sarlo, 269 F. App'x 30, 31 (2d Cir. 2008); United States v. Weisser, 417 F.3d 336, 345 n.6 (2d Cir. 2005). Counsel is "strongly presumed" to have "made all significant decisions in the exercise of reasonable professional judgment." Strickland v. Washington, 466 U.S. 668, 690, (1984).

Liggan does not assert that trial counsel was ineffective in his handling of the juror misconduct issue post-trial—that is, after the jurors submitted their affidavits. The question is whether trial counsel was ineffective for failing to ask the court to undertake a more searching inquiry of the jurors during trial, to determine whether they had been exposed to any press about

the case.

The transcript demonstrates that when Liggan's counsel first raised to the trial court the issue of the media articles, his counsel was unaware of the content of those articles. During this exchange, Liggan's counsel represented that had not yet read the article and stated that Mr. Liggan would be providing him with a copy of it. (See 1/25/05 Tr. 646.) Bowman's counsel characterized the article as focusing on Roberts's fight with George, and the prosecutor agreed, stating that "[t]hat's the one sentence that I'm aware of." (Id.) At that point in the trial, it appears that neither Liggan's counsel, nor Bowman's counsel, nor the prosecutor was aware that the articles mentioned specifically that Roberts had been convicted of the attempted murder of Captain Girven.

Putting aside the question of whether Liggan's counsel appropriately followed up on this issue, there can be no doubt that at the time he first raised his concerns, his decision not to ask the court to pursue a more searching inquiry was within "the wide range of professionally competent assistance." Indeed, at that point, Liggan's attorney had not yet read the articles; the trial court remarked that such an inquiry would be "asking for trouble"; and Bowman's counsel similarly opted not to pursue an inquiry. (Id.)

Liggan's counsel also stated, however, that Liggan would provide him with the article and that he would "take a look at it then." (Id.) The record does not indicate whether Liggan's counsel ever obtained the article from Liggan.[8] The closer question, therefore, is whether the

---

[8]     The supplemental affidavit filed by Liggan's counsel in support of the motion for a new trial does not state specifically whether counsel ever read the articles. The affidavit suggests, however, that counsel did not. (See Steward Decl. Ex. R: 5/9/05 Hornstein Supp. Aff. ¶ 13 ("At no time did any party state that the press report 'included information that Roberts was serving time for shooting Captain Girven.' Accordingly, given my understanding of the coverage, as stated by co-counsel, and as confirmed by the prosecution, counsel concurred with the Court's statement that making an inquiry of the jurors would be 'asking for trouble.'" (alteration omitted).) There is no indication anywhere in the record that counsel was aware, prior to the verdict, that the news accounts stated specifically that Roberts had been convicted of shooting Officer Girven.

20

actions of Liggan's counsel after this colloquy but before the verdict amount to ineffective
assistance of counsel. In other words, was counsel ineffective for not following up on this issue?

After reviewing the record before it, the Court concludes that counsel's failure to revisit
the issue did not rise to the level of ineffective assistance of counsel. With the benefit of
hindsight, this oversight may be viewed as a lapse by an attorney who appears otherwise to have
provided a zealous defense of his client. (See 12/14/05 Tr. (second sentencing) at 31-32 ("[THE
COURT:] I do think the defense attorney did vigorously defend Mr. Liggan, and did an excellent
job of doing that.").) Yet counsel did bring the issue to the trial court's attention and
requested—and obtained—an instruction reiterating that the jurors were not to read or listen to
any press accounts of the case. See United States v. Pappas, 199 F.3d 1324, 1999 WL 980957, at
*2 (2d Cir. 1999) (summary order) (rejecting defendant's argument that counsel was ineffective
for failing to inquire about a news account released during trial that mentioned the defendant's
prior arrest, and emphasizing that the court's instruction "to disregard all news reports about the
case . . . adequately protect[ed]" the defendant). Mindful of the pressures of a trial, the Court
cannot say that trial counsel's errors were "so serious" that he "was not functioning as the
'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466
U.S. 668, 687 (1984).

Because a claim that trial counsel was ineffective would have been without merit,
Liggan's appellate counsel could not have been ineffective for deciding not to raise such a claim.
See Aparicio v. Artuz, 269 F.3d 78, 88 (2d Cir. 2001) ("[T]hus *trial* counsel could not be
ineffective for failing to raise so meritless an issue. *A fortiori, appellate* counsel was not
ineffective for failing to raise an argument that trial counsel was ineffective."). His objection to
Judge Peck's conclusion on this point is therefore overruled.

5.      **Liggan's Right To Present a Defense**

The Court has reviewed the remainder of Judge Peck's R & R and finds no clear error.

One more issue, however, warrants mention.  Liggan asserted in his habeas petition that he was

denied the right to present a defense at trial when the court restricted counsel's direct

examination of him.  (Pet'n at 19 of 20.)  Although Liggan did not object to Judge Peck's

rejection of this argument, the Court wishes to clarify why it finds no clear error in that portion

of the R & R.

A.      **Background**

During Liggan's direct examination in the first trial, his counsel asked him several

questions about a letter he wrote to Roberts from prison after his arrest.  The government had

called Liggan's fiancée during its case-in-chief and asked her to read the letter (which Liggan

gave to her to give to Roberts).[9]  (2/1/05 Winborne Test. 344-49.)  Arguably, a number of the

---

[9]      The complete letter is not a part of the record in this case.  Judge Peck's R & R quoted the letter with the original punctuation as described in the State's brief to the First Department.  Because this recitation is consistent with the testimony of Liggan's fiancée (who read the letter at trial but was frequently interrupted by questions), this Court relies on the punctuation and phrasing included in the People's First Department brief.

The letter thus read, in full: "Love & Loyalty, What the fuck happen to dat? You suppose to be my brother & vise-versa—first and foremost. I just came from the floor & guess who the fuck I see, yeah, Steph—the motherfuckin illest part is she's telling niggas that I gave you up! She telling niggas that I told where she lived at. How come I'm here when you still down in N.I.C. going to court. Yo son from the jump you was suppose to check your motherfuckin bitch & you even telling my motherfucking fiancé that how they keep you for 3 days and let other niggas go? Yo Ida let you know exactly what I know from the start—Remember the day you told me you were going to Florida & I was getting my haircut on my way to work? A-ight—I went to work got back on the block around 10:30 p.m. or 11:00 I seen Aziz an he's asking me what's going on because the FED's came to his house and arrested Will—plus they picked up Porto Rican Ed from Clairmount—you know the one who was suppose to take you to Florida. My first question—why are they picking them up for something we suppose to have done. Right after that—matter of fact the next mourning they roll up in my grandmother's crib looking for me. Now my fiancé tells me what's going on so being that its Saturday mourning I get low until Monday—Now after they run up in my crib I immediately contact Gresey—Now I'm waiting for Monte's wife to come home because can't nobody contact you so she tells me to call Auntie. While I'm talking to Auntie on the phone—your mother and Sezez is on the house phone—Auntie tells me not to say nothing because she doesn't think your going to fold—so that's what I stuck with an that was on my mind & what's in my motherfucking heart. How you going [to] love me when your questioning my loyalness? Sit back & analyze everything from all the information you got! Now after I finished talking to Auntie, your moms and Serez, I got Bresey on a M .U. block to talk—home telling me we fucked up cause this is

statements in the letter were incriminating; Liggan's counsel sought to have his client explain

some of those statements as follows:

> Q:      Where it says, my first question, why are they picking them up for something we supposed to have done?  You see that?
>
> A:      Yes.
>
> Q:      And you underlined "we supposed to."
>
> A:      Yes.
>
> Q:      Is that correct?
>
> A.      Yes.
>
> Q:      What did you mean by that?
>
> MR. O'KEEFE:      Objection.
>
> THE COURT:      Sustained.
>
> Q:      Now, on the last page, you see where my finger is?
>
> A:      Yes.
>
> Q:      Where it says "Where did they get that"—excuse me for saying this, but—"shit from?"  You see that?
>
> A:      Yes.
>
> Q:      What did you mean by that?
>
> MR. O'KEEFE:      Objection.
>
> THE COURT:      Sustained.  Don't answer the question.
>
> MR. O'KEEFE:      Move that it be stricken.
>
> MR. HORNSTEIN:   Your honor, may we approach on this matter?

---

something real serious! Now here comes Monday mourning—mind you I just found out that you didn't go to Florida that Friday—why tell me the bullshit I'm family? Ok Monday mourning I turn myself in to parole but homicide is already there waiting—ok they say I'm not under arrest but I have to come downtown for questioning! You know what that means—we get down to the 32nd precinct & these motherfuckers question me for 13 hours—without a lawyer & without leaving—home like 4 different detectives came in to question me. I held my ground & stayed true to the family. These motherfuckers were making statements like they knew what was going on! Matter of fact they said they already knew that we were there to holdup a social club & in the process police rolled up & you were the asshole to fire. My nigga where did they get that shit from? Plus they asked me all they want is the vest & gun—you know I was stuck but never folded. Yo, home, you gotta let me know what's what—my fiancé is coming to see. Let her know what's what—I need you to get at me because they got me blind. All I know is what the papers talking bout—I ain't speak to Gresey in a minute—matter of fact somebody answered his phone an said he was locked up. Yo home make sure you clear up the bullshit & make sure you holla at me & let me know what's what. Yo I told Steph to tell you to holla at me some. I'm waiting on you!"  (R & R at 10-11 (quoting State 1st Dep't Br. at 37-38).)

THE COURT:        No.

(2/14/05 Liggan Test. 1537-38.)

Defense counsel asked several other questions, and then attempted to conclude his direct

examination by asking: "Mr. Liggan, what did you mean to convey when you wrote a letter to

Sharkima Winborne for Roland Roberts?" (Id. at 1539.) The prosecutor objected and the court

sustained the objection, at which point counsel ended Liggan's direct examination. (Id.)

During a recess in the government's cross of Liggan, defense counsel explained on the

record: "it is my position that Mr. Liggan should have been given the opportunity to explain

what was contained in his letter. The District Attorney certainly is going to be summing up on

that letter and trying to convey that he meant certain—was trying to convey certain information.

I was trying to clear up the misunderstanding perhaps the District Attorney has, so the jury can

understand what Mr. Liggan truly intended when he wrote that letter. I think he should have

been given an opportunity to do that, particularly since they are going to be using it so readily

during their summation." (Id. at 1541.) The Assistant District Attorney stated his position—that

Liggan's testimony about the meaning of the letter was inappropriate because the jurors could

examine the letter themselves and counsel could "argue inferences based upon what is there"—

and then the parties moved on to discussing another matter, without a further ruling from the trial

court. (Id.)

In Liggan's motion for a new trial after the jury returned its verdict, he asserted that he

was deprived of his constitutional right to present a defense when the court restricted his

testimony about the letter. (Steward Decl. Ex. O: 3/29/05 Hornstein Aff. ¶¶ 13-15.) The trial

court rejected this argument, explaining that the questions Liggan's counsel posed about the

letter "invited [Liggan] not to give factual testimony, but to give arguments as to the meaning of

24

the letter." (Steward Decl. Ex. S at 2.)

The First Department affirmed this conclusion, providing several grounds in support of its holding. It agreed with the trial court that the "interpretation called for in defense counsel's questions was in the nature of argument that would be appropriate if made by counsel in summation, but not by a witness on the stand." People v. Liggan, 878 N.Y.S.2d 735, 737 (1st Dep't 2009). Additionally, it explained that "[s]ince defendant never made a timely assertion of a constitutional right to give the excluded testimony, his present constitutional claim is unpreserved, and we decline to review it in the interest of justice." Id. "As an alternative holding," the court continued, "we also reject it on the merits." Id. And "[i]n any event, any error in the court's ruling was harmless under the standards for both constitutional and nonconstitutional error." Id.

In the R & R, Judge Peck explained that "Liggan's trial counsel failed to argue that such rulings violated Liggan's right to present a defense or even his constitutional rights in general. The First Department found the claim unpreserved for appeal. Thus the claim is barred from habeas review by an adequate and independent state law ground." (R & R at 39) (citation omitted).

**B.    Discussion**

Although the Court ultimately agrees that Liggan is not entitled to habeas relief on the grounds that he was deprived of his right to present a defense, several of the First Department's reasons for rejecting this argument merit discussion.

First, this Court is somewhat perplexed as to the basis for the state courts' determination

that Liggan's testimony was inadmissible argument.[10]  There is a difference, it seems, between a criminal defendant offering his interpretation of a third party's statement—which, absent some use of coded language, would likely usurp the jury's function—and a criminal defendant testifying as to what he meant to convey in a letter he wrote.  The former is in effect a lay opinion; the latter asks the defendant to recall specific facts—namely, what he intended to convey when he selected certain words.

That neither the First Department nor the trial court cited any authority for this position is telling.  To the contrary, it seems well established that if a criminal defendant chooses to testify, he may attempt to explain certain seemingly inculpatory statements he made.  In People v. Robinson, 17 N.Y.3d 868, 869 (2011), for instance, the New York Court of Appeals concluded that the trial court erred by precluding the defendant from explaining what he meant when he remarked, after his arrest, that "possession is nine/tenths of the law."  Other authorities similarly recognize a party's entitlement to explain or clarify statements used against him as admissions. See, e.g., 7 Wigmore on Evidence § 1972 (Chadbourn rev. 1978) ("[T]he impeaching force of a party's apparent admission . . . lies in the self-contradictory states of mind which it discloses, and [ ] thus his credit may be restored by an explanation which shows that there was no inconsistency. This explanation may often be made by showing that words were used in a sense different from that claimed by the opponent, or that a different state of facts was in mind at the time of the utterance . . . .").  Whether the statement was offered as testimony at a prior proceeding, made to the police, or written in a letter seems immaterial.

Here, the Assistant District Attorney argued to the jury that various statements made in

---

[10]     When a habeas petitioner challenges a state-court evidentiary ruling, the Court must determine "whether the exclusion was error under state law" and, if so, "whether the error amounted to the denial of [a] constitutional right." Perez v. Phillips, 210 F. App'x 55, 57 (2d Cir. 2006).

Liggan's letter—that Roberts should not "fold" and that the police asked about "the vest and gun"—constituted admissions. (See, e.g., 2/16/05 Tr. 1964 ("If Roland Roberts is the guy with the gun, the guy who shot Girven, the only guy in trouble, and all that Stacy Liggan was doing was trying to avoid the police because he was so afraid of a curfew violation, why is he so concerned about Roland folding? . . . He's concerned about Roland folding, because the police knew about the vest. They knew about the gun. They knew about the robbery . . . .").) The testimony Liggan sought to introduce thus appears to have been an appropriate attempt to explain these purported admissions.

This Court has similar concerns about rejecting Liggan's claim as unpreserved. To be sure, New York law requires that a contemporaneous objection be made to preserve arguments for appeal, and the Second Circuit has concluded that a defendant's failure to object at trial, or to state sufficiently the grounds for his objection, constitutes an adequate and independent state law ground for denying habeas relief. See, e.g., Whitley v. Ercole, 642 F.3d 278, 286 (2d Cir. 2011). Moreover, in a summary order addressing somewhat similar facts, the Second Circuit rejected a habeas petitioner's argument that he sufficiently raised a due process claim at trial when his counsel used the word "unfair" to challenge an evidentiary ruling. Wright v. Duncan, 500 F. App'x 36, 38 (2d Cir. 2012). In holding that the due process claim was unpreserved, the Circuit explained that "the New York Court of Appeals has long rejected invitations to review constitutional arguments purportedly raised implicitly in the trial court." Id.; see also People v. Kello, 96 N.Y.2d 740, 743 (2001) (holding that defendant's Confrontation Clause claim was unpreserved where counsel's objection at trial was based only on hearsay).

Application of the rule in this case, however, gives the Court pause because of counsel's repeated attempts to raise the issue. As described above, when the trial court first sustained the

objection to the proffered testimony, defense counsel asked permission to "approach on this matter"—a request the trial court denied. (Tr. 1538.) At a recess during the People's cross examination of Liggan, defense counsel then placed on the record his reasons for seeking to introduce the testimony, stating that Liggan "should have been given an opportunity" to explain what he "truly intended when he wrote that letter." (Id. at 1541.) Although counsel did not specifically use the phrase "right to present a defense" or refer to the Constitution—deficiencies that the First Department apparently concluded were determinative—he certainly conveyed the essence of his argument. Cf. Lee v. Kemna, 534 U.S. 362, 382 (2002) (concluding that petitioner's claims were not procedurally defaulted, where he had "substantially complied" with the state rule, "given the realities of trial").

Perhaps most significantly, the record suggests that the trial court would not have ruled any differently had defense counsel explicitly invoked his client's right to present a defense. In Liggan's motion for a new trial, counsel specifically argued that Liggan was denied his constitutional right to present a defense and cited cases describing this right. (Steward Decl. Ex. O: 3/29/05 Hornstein Aff. ¶¶ 13-15.) The trial court's written decision denying the new trial motion reasoned only that the proposed questions invited Liggan "not to give factual testimony, but to give arguments as to the meaning of his letter." (Id. Ex. S at 2.)

In view of these circumstances, it is difficult to discern how penalizing Liggan for his counsel's failure to use the phrase "right to present a defense" at trial would further the two "principal objectives" of New York's contemporaneous objection rule: "to ensure that parties draw the trial court's attention to any potential error while there is still an opportunity to address it," and "to prevent those who fail to do so from 'sandbagging' the opposing party and the trial court on appeal." Whitley v. Ercole, 642 F.3d 278, 288 (2d Cir. 2011). Liggan's counsel made

clear the basis for seeking to introduce the testimony and his justification for why he was entitled to do so, and nothing in the record suggests that he attempted to "sandbag" the trial court or the State.

In the end, however, even assuming that Liggan properly preserved his constitutional claim, this Court concludes that he is not entitled to habeas relief. The First Department held that "any error in the court's ruling was harmless under the standards for both constitutional and nonconstitutional error." People v. Liggan, 878 N.Y.S.2d 735, 737 (1st Dep't 2009). This conclusion was neither "contrary to," nor "involved an unreasonable application of, clearly established federal law," 28 U.S.C. § 2254(d)(1).

The Supreme Court's decision in Chapman v. California, 386 U.S. 18, 24 (1967), "binds a state appellate court—directly reviewing a lower state court—to dispose of federal constitutional errors as harmless only if the error was harmless beyond a reasonable doubt." Gutierrez v. McGinnis, 389 F.3d 300, 304 (2d Cir. 2004). "[W]hen a state court explicitly conducts harmless error review of a constitutional error, a habeas court must evaluate whether the state unreasonably applied Chapman" under 28 U.S.C. § 2254(d)(1). Id. at 306.

To determine whether an error was harmless, the courts must "consider the importance of the wrongly admitted evidence, and the overall strength of the prosecution's case." Jackson v. Conway, 763 F.3d 115, 140 (2d Cir. 2014). "The strength of the prosecution's case without the erroneously admitted evidence"—or, in this case, with the wrongly excluded evidence—"is probably the single most critical factor in determining whether the error was harmless." Id. Court assess the importance of the wrongly excluded evidence by considering "(1) the prosecutor's conduct with respect to the evidence, (2) whether the evidence bore on an issue plainly critical to the jury's decision, and (3) whether the evidence was material to the

establishment of the critical fact, or whether it was instead corroborated and cumulative." Id. at 141.

Here, despite testimony by a co-conspirator describing the planned robbery and recounting the night's events—which appeared to be consistent with testimony from Captain Girven, testimony from other witnesses, and text message records—a majority of jurors purportedly were in favor of acquitting Liggan on all but one of the counts he faced. (See Steward Decl. Ex. O: 5/30/05 Kalba Aff. ¶ 4; id. Ex. O: 5/30/05 Harris Aff. ¶ 4.) The jury hung on these counts, suggesting that the evidence the People presented was less than overwhelming.

Ultimately, however, the First Department's conclusion was not unreasonable because Liggan's attorney forcefully argued for an alternative interpretation of the letter—an interpretation that, presumably, Liggan would have advanced in his testimony, had he not been precluded from doing so.

This point is best illustrated by an examination of several of the statements in the letter. In the letter, Liggan described to Roberts how he was questioned by police, emphasized that he did not "fold," and made clear that he wanted Roberts to know that he was not talking to the police. Arguably the most damaging portion of the letter is Liggan's description of his questioning by police, in which he explains that they "were making statements like they knew what was going on. Matter of fact, they said they already knew that we were there to holdup a social club and in the process police rolled up and you were the asshole to fire. My nigga, where did they get that shit from? Plus they asked me, all they want is the vest and gun. You know I was stuck but never folded." (2/1/05 Winborne Test. 348.)

Logically, the phrase "where did they get that shit from," could have one of two meanings: "how did police find out what really happened that night?" or "where did the police

30

come up with this nonsense?"  The prosecution asserted that the first interpretation was the correct one (see 2/16/05 Tr. 1963-64), whereas Liggan presumably would have testified that he meant to convey the second, as his lawyer argued in summation.  (See 2/16/05 Tr. 1843.)

Liggan's testimony regarding what he intended to convey in the letter would have been probative.  As described above, there is a difference, in this Court's view, between Liggan testifying about what he meant to say in the letter and a third party urging the jury to adopt its own interpretation of the letter: the former is admissible on direct examination and the latter is not.  Had Liggan been permitted to testify about the letter, the jury could have evaluated his demeanor in order to determine whether to credit his testimony.  Yet the principal way in which the jury would have assessed the veracity of Liggan's testimony on this point would have been by analyzing the text of the letter, and determining whether that text was consistent with Liggan's account or whether it suggested a different interpretation.  Liggan's counsel spent a significant portion of his closing argument—without objection from the prosecution—walking the jury through the text of the letter and offering an interpretation consistent with Liggan's innocence.  (See 2/16/05 Tr. 1843 ("I submit to you that what Stacy Liggan is saying at this point is where are they getting this bull from?  Where are they getting this nonsense from?  There never was an attempted robbery.").)

The mere fact that Liggan's counsel was able to offer his interpretation in summation did not obviate the need for Liggan's testimony concerning the letter.  Such testimony would have provided Liggan's own account of why he chose the words he did in the letter and would have permitted the jury to assess Liggan's credibility on this point.  It would have been probative, no doubt—but only marginally so.[11]  Ultimately, the jury had before it the text of the letter, the

---

[11]     The Court also notes that at least some of the jurors at Liggan's first trial apparently credited his testimony that he saw Roberts throw a gun as he was running from the scene; as the jurors explained, it was on the basis of that

argument of counsel urging the jury to adopt a non-incriminating interpretation of it (namely, that there was no intended robbery), and Liggan's testimony that he did not intend to commit a robbery on the night in question.

Accordingly, in view of AEDPA's deferential standard, the Court cannot say that the First Department's application of the harmless error standard was "unreasonable."

## 6.   Certificate of Appealability

The Court parts ways with Judge Peck in one regard. Although the Court ultimately agrees that Liggan is not entitled to habeas relief on the grounds that he was denied the right to present a defense, in its view the question is one "that reasonable jurists could debate"—as suggested by the length of its own discussion of the issue. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003); see 28 U.S.C. § 2253(c)(2) (providing that a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right").

The Court thus grants Liggan a certificate of appealability on the following question: did the First Department unreasonably apply clearly established federal law when it held that he was not entitled to a new trial on the grounds that the trial court denied him the right to present a defense?

## CONCLUSION

The Court thus overrules Liggan's objections to Judge Peck's R & R.  The Petition is denied.  Liggan is entitled to a certificate of appealability on the issue described above and is

---

testimony that they convicted him of criminal possession of a weapon in the third degree. (See Steward Decl. Ex. O: 3/30/05 Kalba Aff. ¶¶ 5-7; id. Ex. O: 3/30/05 Harris Aff. ¶¶ 5-7 ("The conviction of defendant Liggan on one count of criminal possession of a weapon in the third degree was based upon our application of the Court's instructions relating to constructive possession and upon defendant Liggan's testimony that he observed Roland Roberts throw a gun on Bradhurst Avenue."). Given that these jurors already credited Liggan's testimony, presumably they would have voted to convict him of the weapon possession count even if he had been permitted to give a full explanation of his reasons for writing the letter.

granted *in forma pauperis* status for purposes of that appeal, should he choose to take one.

The Clerk of Court is respectfully requested to close the case.

SO ORDERED.

Dated:      October 17, 2014
            New York, New York

_____
Ronnie Abrams
United States District Judge